# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) <br> **LAWRENCE MCCARTHY,** ) <br> ) <br>        **Relator-Plaintiff,** ) <br> ) <br>      **vs.** ) <br> ) <br> **MARATHON TECHNOLOGIES, INC.,** ) <br> **SIGMATEK, INC., d/b/a** ) <br> **MTI SIGMATEK, and** ) <br> **JERRY KOZLOWSKI,** ) <br> ) <br>       **Defendants.** ) | 1:11-cv-07071 <br> Judge James F. Holderman <br> Magistrate Judge Morton Denlow <br><br> **FILED UNDER SEAL** <br><br> **JURY DEMANDED** <br><br> **FILED** <br> OCT - 6 2011 |

**COMPLAINT**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Relator-Plaintiff, LAWRENCE MCCARTHY, by and through his attorneys, HOLMAN

& STEFANOWICZ, LLC., brings this False Claims Act ("FCA") Complaint on behalf of the

UNITED STATES OF AMERICA against MARATHON TECHNOLOGIES, INC.

("MARATHON"), an Illinois corporation, SIGMATEK, INC. ("SIGMATEK"), an Illinois

corporation, collectively MARATHON and SIGMATEK d/b/a MTI SIGMATEK, and JERRY

KOZLOWSKI ("KOZLOWSKI"), the President and Owner of MARATHON and SIGMATEK

(collectively referred to herein as "Defendants"). Defendants have as their clients defense-

related United States Federal Government agencies, including the United States Army and the

United States Navy.

## I.    INTRODUCTION.

1.    Relator-Plaintiff's case arises from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 and 18 U.S.C. § 1001.  Relator-Plaintiff brings this action as a *qui tam* action for himself and for the United States Government, pursuant to 31 U.S.C. § 3730(b) and (h).

2.    From at least January 2006 until the present, the Defendants committed acts and engaged in activities creating liabilities pursuant to the FCA, 31 U.S.C. § 3729(a)(1)(A), (B) and (C).  The FCA states that:

    (a)    Liability for Certain Acts.

      (1) - Any person who --

        (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

        (3)    conspires to commit a violation of subparagraph (A), (B). . . .

3.    The FCA also states that any person who knowingly presents a false or fraudulent claim for payment "is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00, plus three (3) times the amount of damages which the Government sustains. . . ."

4.    Knowing and Knowingly are defined as:

    For the purposes of this section, the terms 'knowing' and 'knowingly' mean that a person, with respect to the information --

      (i)    has actual knowledge of the information;

      (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

      (iii)    acts in reckless disregard of the truth or falsity of the information; and

no proof of specific intent to defraud is required for a successful claim under the False Claims Act. . . .

5.      Defendants knowingly submitted, caused to be submitted or facilitated the submission of false and fraudulent documents (including Certificates of Conformance) to federal agencies, certifying that certain MK93 Gun Mounts and M3 Tripods, and their components and parts, were manufactured in accordance with contract terms and design specifications, and would perform properly and could be safely used in military combat and during military exercised by military personnel.  However, many of these MK93 Gun Mounts and M3 Tripods, their components and parts, were not combat-worthy, were unsafe, should not have been used for military combat and/or military exercises, placing, and continue to place military personnel in grave bodily danger.  These false and fraudulent documents were submitted to the United States Government accompanied by documents requesting payment and approval.

6.      All claims for payment submitted by the Defendants to the United States Government were knowingly false because Defendants actually knew, recklessly disregarded or deliberately ignored the fact that the manufactured product and associated parts were made in violation of contract terms, design specifications, and the Department of Defense's Test Method Standards (MIL-STD-1916[1]).  The Defendants falsely certified that the Defendants operated in compliance with the contractual quality assurance requirements of ISO9001[2].

---

[1] MIL-STD-1916 is the currently approved Department of Defense's Test Methods Standard for Acceptance of Product and is approved by all Departments and Agencies of the Department of Defense.

[2] ISO9000 is the currently approved standard of the Department of Defense that contractually defines the Defendants' minimum Quality Management System (QMS) requirements.  ISO9001 is maintained by ISO, the International Organization for Standardization and is administered by accreditation and certification bodies.  The rules are updated, as the requirements motivate changes over time.  The version that was in effect for 2005 until 2008 was ISO9001:2000 and the version in affect after that is ISO9001:2008.  These Quality Management System Requirements are mandatory for use by all agencies.

7.    Defendants falsely certified on the Certificates of Conformance[3] on each lot of the MK93 Gun Mount and M3 Tripods sold to the United States Government that the aforementioned requirements were being met.  Each lot sold to the United States Government was fraudulent and the certification on each Certificate of Conformance was false.  The MK93 Gun Mounts and M3 Tripods at issue were defective because they:

     a.    have been assembled with components, parts and/or structural elements that were manufactured in violation of contract specifications; and

     b.    were not verified through appropriate quality assurance processes and competent and/or ethical quality assurance personnel; and

     c.    were not submitted for the appropriate testing in violation of contract and design specifications.

8.    Additionally, the Defendants knowingly presented to employees of the United States Government false or fraudulent claims for payment:

     a.    as if the MK93 Gun Mounts and M3 Tripods, their components and parts, were working properly and did not contain nonconforming parts; and

     b.    as if the Defendants were following the appropriate quality assurance processes and the requirements listed above; and

     c.    as if the Defendant had submitted the MK93 Gun Mounts and M3 Tripods, their components and parts for the appropriate testing.

9.    The Defendants knowingly produced and delivered to the United States Government, sub-par, Non-Military Grade, nonconforming MK93 Gun Mounts and M3 Tripods using improper, insufficient, and fraudulent manufacturing and quality assurance processes.

10.    During the relevant time period, Defendants conspired to defraud the United States Government by getting false and fraudulent claims allowed and paid in connection with multiple multi-million dollar contracts.

---

[3] Certificates of conformance is a document signed or otherwise authenticated by an authorized individual certifying the degree to which items or services meet specified requirements.

11.     Relator-Plaintiff, LAWRENCE MCCARTHY, uncovered serious nonconformance in the manufacturing and quality assurance processes at Defendants, MARATHON and SIGMATEK.

12.     The problems identified by the Relator-Plaintiff constitute serious and ongoing breakdowns in the quality assurance functions and processes at Defendants and posed and continue to pose serious hazard to military personnel.

## II.     JURISDICTION AND VENUE.

13.     This Court has jurisdiction of this case under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because:

> a.     Defendants conduct business in the Northern District of Illinois - Eastern Division;
>
> b.     many of the acts by Defendants proscribed by 31 U.S.C. § 3729 occurred in the Northern District of Illinois - Eastern Division; and
>
> c.     Defendants' corporate offices are located in the Northern District of Illinois - Eastern Division.

## III.     PARTIES.

15.     Relator-Plaintiff, LAWRENCE MCCARTHY, is an adult citizen of the State of Illinois.  The Relator began working for Defendant, MARATHON, on or about February 14, 2005, as the Buyer/Purchasing Manager.  As the Buyer/Purchasing Manager, LAWRENCE MCCARTHY was responsible for the purchasing and acquisition of all components, raw materials, services and outside vendors in connection with the manufacturing and production of

5

the MK93 Gun Mounts and M3 Tripods. Relator-Plaintiff, LAWRENCE MCCARTHY, was also the ISO9001 Administrator/Internal Auditor/Management Representative for MARATHON. As the ISO9001 Administrator/Internal Auditor/Management Representative, LAWRENCE MCCARTHY was responsible for obtaining and maintaining the ISO9001 certification, performing and reporting on required internal audits, and dealing directly with the accreditation and certification bodies. On January 17, 2011, Relator-Plaintiff, LAWRENCE MCCARTHY, was forced to terminate his employment with MARATHON.

16.     Plaintiff, the United States of America, contracted directly with Defendants to provide the MK93 Gun Mounts and M3 Tripods to various government agencies within the Department of Defense.

17.     Defendant, MARATHON TECHNOLOGIES, INC. is an Illinois corporation that was incorporated on July 5, 1983. MARATHON is a private company that is owned and operated by JERRY KOZLOWSKI. MARATHON also does business as MTI SIGMATEK. MARATHON'S principal place of business is located at 800 Nicholas Blvd., Elk Grove Village, Illinois 60007. MARATHON is a contractor to the Department of Defense for the contracts involved in this Complaint for the MK93 Gun Mounts.

18.     Defendant, SIGMATEK, INC. is an Illinois corporation that was incorporated on February 25, 2002. SIGMATEK is a private company that is owned and operated by JERRY KOZLOWSKI. SIGMATEK also does business as MTI SIGMATEK. SIGMATEK'S principal place of business is located at 800 Nicholas Blvd., Elk Grove Village, Illinois 60007. SIGMATEK is a contractor to the Department of Defense for the contracts involved in this Complaint for the M3 Tripods.

19.     Defendant, JERRY KOZLOWSKI, is the sole owner and operator of MARATHON and SIGMATEK, which also do business as MTI SIGMATEK.

## IV.     FACTUAL ALLEGATIONS.

20.     The Defendants conspired and committed acts of fraud to intentionally deviate and/or omit critical quality assurance functions and processes to increase their profits by reducing the cost of producing the MK93 Gun Mounts and M3 Tripods, their components and parts, thereby producing and delivering "Non-Military Grade" product, but representing the product as "Military Grade[4]" to the United States Government.

21.     The Defendants failed in a number of areas in its quality assurance and manufacturing processes by continuing to produce and deliver nonconforming MK93 Gun Mounts and M3 Tripods, their components and parts, to the United States Government.

22.     The Defendants' quality assurance program specifically failed to ensure that the MK93 Gun Mounts and M3 Tripods, their components and parts, were produced in a manner which conformed to the approved and required contract terms, production methods, government engineering requirements, design specifications, and to the Department of Defense's inspection and test standards (MIL-STD-1916) and the contractual requirements of ISO9001 -- Quality Management System Requirements.

23.     The Defendants then fraudulently conspired to conceal this information from the United States Government and failed to inform the United States Government of their breakdown of its quality assurance functions and processes, including its production and delivery

---

[4] Military Grade product is a term used to describe product and/or material produced and delivered to various government agencies of the United States that conforms to strict quality assurance requirements defined by the Department of Defense, such as MIL-STD-1916 and ISO9001. The cost to produce a Military Grade product is significantly more than the cost to produce a "Non-Military Grade" product due to these additional requirements.

of noncompliant MK93 Gun Mounts and M3 Tripods, their components and parts, to the United States Government.

24.     Because of their fraud and conspiracies, from at least between 2006 and 2011, the Defendants were able to outbid the competition, which resulted in the Defendants receiving in excess of $20 Million in contracts to produce and deliver MK93 Gun Mounts and M3 Tripods to the United States Government.

## RELATOR'S EMPLOYMENT WITH THE DEFENDANTS

25.     On or about February 14, 2005, the Relator was hired by Defendant KOZLOWSKI to be the Buyer/Purchasing Manager for Defendant MARATHON.

26.     Shortly after beginning his employment with MARATHON, the Relator learned that SIGMATEK, a separate corporation, was run out of the same location as MARATHON, and both MARATHON and SIGMATEK, frequently did business under the assumed name of MTI SIGMATEK.

27.     Depending on the business need, Defendant KOZLOWSKI would use the company name MARATHON, SIGMATEK and/or MTI SIGMATEK.

28.     As the Buyer/Purchasing Manager, the Relator was responsible for the purchasing and acquisition of all components, raw materials, services and outside vendors in connection with the manufacturing and production of the MK93 Gun Mounts and M3 Tripods.

29.     In or about August, 2006, KOZLOWSKI advised the Relator that he would also be the ISO9001 Administrator/Internal Auditor/Management Representative for MARATHON. As the ISO9001 Administrator/Internal Auditor/Management Representative, the Relator was

responsible for obtaining and maintaining the ISO9001 certification, performing and reporting on required internal audits, and dealing directly with the accreditation and certification bodies.

30.     Without a background in and/or training regarding ISO9001, the Relator was assigned the task of being the ISO9001 Administrator/Internal Auditor/Management Representative for MARATHON.  The Relator had no prior experience with quality assurance processes and was uncertain as to what an ISO9001 compliant Quality Management System was.

31.     The Relator also did not have experience in and/or training in the Department of Defense's inspection and test standards (MIL-STD-1916).

32.     In addition to the task of confirming that the quality assurance processes and procedures were compliant with the ISO9001 Quality Management System, the Relator reviewed the manufacturing and quality assurance processes to ensure that the Defendants were in compliance with the specifications and requirements of the contracts involved, which included, but was not limited to MIL-STD-1916.

33.     It was evident to the Relator that the Defendants had significant problems producing conforming product and then accurately inspecting and testing the product to ensure conformance.

34.     As a result of his involvement in the quality assurance processes, it was also evident to the Relator that the Defendants were knowingly producing and delivering to the United States Government MK93 Gun Mounts and M3 Tripods that did not meet the acceptable quality levels defined by the contracts involved and MIL-STD-1916.

## EVENTS LEADING UP TO THE RELATOR'S DEPARTURE

35. In connection with the ISO9001 re-certification process, Defendant KOZLOWSKI advised and instructed the Relator to merely change the dates in the Procedure Manuals, recreate the necessary paperwork, and forego the actual internal audits that were necessary to assure compliance with the ISO9001 Quality Management System.

36. It was evident to the Relator that the Defendants did not have the ISO9001 Quality Management System in place but merely produced the fabricated documentation necessary to obtain certification from the accreditation and certification bodies.

37. It was also evident to the Relator that the Defendants did not have any type of quality management system in place to confirm compliance with MIL-STD-1916.

38. In or about February 2010, Relator discovered that the United States Government MK93 Gun Mounts specifications required magnetic particle inspections on the following three (3) part numbers: 12999574, 5830054, 5830084. Magnetic particle inspections were required to be performed by an outside approved vendor and were necessary to test and confirm the integrity of welds and the stress reliance of the parts.

39. The Relator was aware of the fact that the three (3) identified parts of the MK93 Gun Mounts were not being sent out for the required magnetic particle inspections. The Relator confirmed that the Defendants were not and had not sent any parts in connection with the MK93 Gun Mounts for the required magnetic particle inspections.

40. The Relator questioned Defendant KOZLOWSKI why the identified parts of the MK93 were not being sent out for the required magnetic particle inspections.

41.     The Relator discovered that in violation of the United States Government MK93 Gun Mounts specifications the Defendants used the following non-approved vendors in order to expedite the manufacturing of the MK93 Gun Mounts: Chem Processing, Inc., 3910 Linden Oakes Drive, Rockford, Illinois, to perform phosphate coating; and Core Finishing, 717 Thomas Drive, Bensenville, to apply 383 Green Carc Paint.

42.     The Relator discovered that in violation of the United States Government MK93 Gun Mounts specifications the Defendants used the following non-approved vendors to purchase non-Mil-Spec materials in order to expedite the manufacturing of the MK93 Gun Mounts: MSC Industrial Supply Co. to purchase hardware and rivets; and McMaster-Carr, 600 North County Line Road, Elmhurst, Illinois, to purchase hardware and rivets.

43.     The Relator learned that Defendant SIGMATEK fraudulently obtained HUBZone classification and misrepresented itself as qualified to participate in bidding for the M3 Tripod, that was specifically set aside for companies that qualified for the HUBZone program. SIGMATEK was awarded the M3 Tripod contract (W52H09-08-D-0147) from the United States Army despite the fact that it improperly obtained its HUBZone classification, because SIGMATEK failed to satisfy the requirements for HUBZone classification.

44.     The Relator discovered that in violation of the United States Government M3 Tripods specifications the Defendants used the following non-approved vendors in order to expedite the manufacturing of the M3 Tripods: Chem Processing, Inc., 3910 Linden Oakes Drive, Rockford, Illinois, to perform phosphate coating.

45.     The Relator discovered that in violation of the United States Government M3 Tripods specifications the Defendants used the following non-approved vendors to purchase non-mill specific materials in order to expedite the manufacturing of the M3 Tripods: MSC Industrial Supply Co. to purchase hardware; and McMaster-Carr, 600 North County Line Road, Elmhurst, Illinois, to purchase hardware; and Valley Fastener Group, LLC, 1490 Mitchell Road, Aurora, Illinois, to purchase rivets.

46.     In or about December 2010, the DCMA auditor came into MARATHON, for the MK93 Gun Mounts, and SIGMATEK, for the M3 Tripod, to perform audits in connection with the Defendants' manufacturing of the MK93 Gun Mounts and the M3 Tripods.

47.     The Defendants had difficulties producing the required documentation requested by the DCMA auditor in connection with the proper manufacturing of the MK93 Gun Mounts and the M3Tripods.  Defendant KOZLOWSKI was growing more and more concerned because of the lack of necessary documentation, and was applying continued pressures upon the Relator who knew that the Defendants were knowingly producing and delivering to the United States Government MK93 Gun Mounts and M3 Tripods that did not meet the acceptable quality levels defined by the contracts involved and MIL-STD-1916.

48.     The Relator knew that Defendant KOZLOWSKI would blame the Relator for any noncompliance, and that KOZLOWSKI was concerned that the Relator would be truthful in response to the DCMA auditor's questions.  Accordingly, on or about January 17, 2011, as a result of KOZLOWSKI'S behavior towards the Relator, the Relator was forced to terminate his employment with the Defendants.

## EVENTS FOLLOWING THE RELATOR'S DEPARTURE

49.     On or about January 18, 2011, the Relator contacted the Federal Service Help Desk to inquire about the appropriate agency to contact in connection with the issues he observed while employed with Defendants.  The Federal Service Help Desk asked the Relator a number of questions and provided him with an incident number: 110118-000217.  A follow-up conversation with the Federal Service Help Desk produced a new incident number: 110118-001374.

50.     On January 28, 2011, the Relator was interviewed by Special Agent Brendan Kowalik  Department of Defense, Defense Criminal Investigative Services, Office of Inspector General, in which the Relator discussed in detail the Defendants' quality assurance violations and shipments of defective and/or non-conforming products to the United States Government.

51.     On or about March 24, 2011, the Relator was interviewed a second time by SA Brendan Kowalik, in which the Relator provided further details of the Defendants' quality assurance violations and responded honestly to any and all questions presented by SA Brendan Kowalik.  SA Brendan Kowalik advised the Relator that it would be prudent for him to retain counsel to further represent him in connection with his knowledge of the Defendants' violations.

52.     Following the retention of legal counsel, Holman & Stefanowicz, LLC, the Relator has continued to be cooperative with SA Brendan Kowalik's investigation, responding to all requests for additional information.

## DEFENDANTS' CONTRACTS

53.     On or about September 2, 2004, Defendant MARATHON won a $13,088,644 firm-fixed-price contract (W52H09-04-D-0133) from the United States Army to produce and deliver MK93 Heavy Machine Gun Mounting Systems ("MK93 Gun Mount"). The MK93 Gun Mount is used to lessen the recoil of heavy weapons like the 40mm MK19 Grenade Machine Gun and the .50 Caliber/12.7mm Heavy Machine Gun, improving their accuracy. It attaches to a tripod for infantry use, but it's seen much more frequently as part of a vehicular mount. The MK93 Gun Mount requires no external adapters or tools, and consists of a gun carriage and cradle assembly, a train stop bracket, an ammunition can holder, a bolt-on small pintle, a bolt-on large pintle, and a stowage bar assembly. This contract was modified several times and eventually grew to be a $21.7 million firm-fixed price contract for MK93 Gun Mounts (W52H09-09-D-305). This contract was in effect between the United States and MARATHON at the time of the events giving rise to this action.

54.     On or about January 14, 2008, Defendant SIGMATEK won a $9,244,642 firm-fixed-price contract (W52H09-08-D-0147) from the United States Army to produce and deliver M3Tripod Mounts ("M3 Tripod"). The M3 Tripod is the standard ground mount of the M2 machine gun. It is a folding tripod with three, telescopic, tubular legs connected at the tripod head. Each leg ends in a metal shoe that can be stamped into the ground for greater stability. This contract was in effect between the United States and SIGMATEK at the time of the events giving rise to this action.

## DEFENDANTS' COMPLIANCE WITH THE DEPARTMENT OF DEFENSE'S REQUIREMENTS FOR PAYMENT

55.     The contracts with MARATHON and SIGMATEK involved with the United States Government required payment upon the delivery of the MK93 Gun Mounts and M3 Tripods.

56.     Pursuant to the above contracts, the products were delivered to and paid for by the United States Government.

57.     Each delivery or lot was accompanied by a DD Form 250 and a Certificate of Conformance. The Certificate of Conformance stated, among other things, that the accompanying lot:

- "conforms with all requirements of the contract"

- "the items covered by this certificate perform to all contract requirements"

- "this certificate is made for the purpose of inducing payment and with knowledge that the information and certification may be used as a basis for payment".

58.     Certificates of Conformance were prepared by the Defendants and signed by Defendant KOZLOWSKI, and expressly represented compliance with the contract terms and requirements. In or about 2008, Defendants started preparing and sending the necessary documentation via computer electronically.

59.     DD Form 250s and Certificates of Conformance prepared by the Defendants and signed by Defendant KOZLOWSKI were submitted to the United States Government for the purpose of obtaining payment. Payment was made by the United States Government in regard to the contracts enumerated in this Complaint.

60.     By submitting the DD Form 250s and Certificates of Conformance, the Defendants expressly and implicitly represented compliance with the terms and requirements of the contracts with the United States Government.

## SPECIFIC VIOLATIONS BY DEFENDANTS OF CONTRACTUAL REQUIREMENTS

61.     From at least January 2006 to at least January 2011, when each request of payment was submitted in regard to the contracts referred to in this Complaint, the Defendants knew that the MK93 Gun Mounts and M3 Tripods did not comply with the contract specifications and requirements.  Additionally, the Certificates of Conformance were false and the Defendants knew they were false.  As a consequence, the Defendants' actions created multiple liabilities as defined in the False Claims Act, 31 U.S.C. §3729(a)(1)(A), (B) and (C) as described in this section and in the remaining sections of this Complaint.

62.     The Defendants knowingly produced MK93 Gun Mounts and M3 Tripods without complying with the contractual requirements of MIL-STD-1916.[5]

63.     The Defendants did not ensure that product purchased from suppliers conformed to the specified purchasing requirements.  The Defendants also did not evaluate and select suppliers on their ability to supply product in accordance with the United States Government's requirements as contractually required by ISO9001:2000, Section 7.4.1, Purchasing Process.[6]

---

[5] MIL-STD-1916 is the only Department of Defense's approved inspection and test standards for product acceptance.  Adherence to the standard is specifically defined in the contract between the Defendants and the United States Army.

[6] 7.4.1 Purchasing Process - The organization shall ensure that purchased product conforms to specified purchase requirements.  The type and extent of control applied to the supplier and the purchased product shall be dependent upon the effect of the purchased product on subsequent product realization or the final product.  The organization shall evaluate and select suppliers based on their ability to supply product in accordance with the organization' requirements.  Criteria for selection, evaluation and re-evaluation shall be established.  Records of the results of evaluations and any necessary actions arising from the evaluation shall be maintained.

64.     The Defendants did not establish and implement the inspection or other activities necessary for ensuring that purchased product met the specified purchase requirements as contractually required by ISO9001:2000, Section 7.4.3, Verification of Purchased Product.[7]

65.     The Defendants did not ensure that product which did not conform to product requirements was identified and controlled to prevent its use or delivery to the United States Government as contractually required by ISO9001:2000, Control of Nonconforming Product.[8]

66.     The Defendants did not adequately address nonconforming (defective) product by:

    (a)  taking action to eliminate the nonconformance (defect) detected;

    (b)  taking action to prevent the defective product from being delivered to the customer (the United States Government); and

    (c)  authorizing its use, release, or acceptance under concession by the United States Government.

67.     Records of the nature of nonconformities and any subsequent actions taken, including concessions obtained by the United States Government were not maintained.

68.     The Defendants did not plan or carry out production under controlled conditions as contractually required by ISO9001:2000, Section 7.5.1, Control of Production and Service Provision.[9]

---

[7] 7.4.3 Verification of Purchased Product - The organization shall establish and implement the inspection or other activities necessary for ensuring that purchased product meets specified purchase requirements. Where the organization or its customer intends to perform verification at the supplier's premises, the organization shall state the intended verification arrangements and method of product release in the purchasing information.
[8] 8.3 Control of Nonconforming Product - The organization shall ensure that product which does not conform to product requirements is identified and controlled to prevent its unintended use or delivery. The controls and related responsibilities and authorities for dealing with nonconforming product shall be defined in a documented procedure. The organization shall deal with nonconforming product by one or more of the following ways:
    (a) by taking action to eliminate the detected nonconformity;
    (b) by authorizing its use, release or acceptance under concession by a relevant authority and, where applicable, by the customer;
    (c) by taking action to preclude its original intended use or application.
Records of the nature of nonconformities and any subsequent actions taken, including concessions obtained, shall be maintained.

69.     The Defendants did not adequately control documents that were essential to properly produce, inspect, and test the product as contractually required by ISO9001:2000, Section 4.2.3, Control of Documents.[10]

70.     The Defendant did not:

(a)  approve documents for adequacy prior to issue;

(b)  review and update as necessary and re-approve documents;

(c) ensure that changes and the current revision status of documents are identified;

(d)  ensure that relevant versions of applicable documents are available at points of use;

(e)  ensure that documents remain legible and readily identifiable;

(f)  ensure that documents of external origin are identified and their distribution controlled, and

(g)  prevent the unintended use of obsolete documents, and to apply suitable identification to them if they are retained for any purpose.

---

[9] 7.5.1 Control of Production and Service Provision - The organization shall plan and carry out production and service provision under controlled conditions. Controlled conditions shall include, as applicable:
    (a)  the availability of information that describes the characteristics of the product; and
    (b)  the availability of work instructions, as necessary.

[10] 4.2.3 Control of Documents - Documents required by the quality management system shall be controlled. Records are a special type of document and shall be controlled according to the requirements. A documented procedure shall be established to define the controls needed:
    (a)  approve documents for adequacy prior to issue;
    (b)  review and update as necessary and re-approve documents;
    (c) ensure that changes and the current revision status of documents are identified;
    (d)  ensure that relevant versions of applicable documents are available at points of use;
    (e)  ensure that documents remain legible and readily identifiable;
    (f)  ensure that documents of external origin are identified and their distribution controlled, and

    (g)  prevent the unintended use of obsolete documents, and to apply suitable identification to them if they are retained for any purpose.

71.     The Defendants did not apply suitable methods for monitoring the production equipment (and associated processes) and to ensure the product being produced and delivered to the United States Government conformed to all the product specifications and the quality assurance requirements of ISO9001:2000, Section 8.2.3, Monitoring and Measurements of Processes.[11]

72.     The Defendants did not ensure that their employees were adequately trained and competent to perform their assignments as required by ISO9001:2000, Section 6.2.2, Competence, Awareness and Training.[12]  Defendant KOZLOWSKI specifically instructed employees not to follow the requirements set forth in ISO9001:2000.

73.     The Defendant did not:

    (a)  determine the necessary competence for personnel performing work that affected product quality;

    (b)  provide training or take other actions to satisfy these needs;

    (c)  evaluate the effectiveness of the actions taken.

    (d)  ensure that its personnel were aware of the relevance and importance of their activities and how they contribute to the achievement of the quality objectives;

    (e)  maintain appropriate records of education, training, and experience.

---

[11] 8.2.3 Monitoring and Measurement of Processes - The organization shall apply suitable methods for monitoring and, where applicable, measurement of the quality management system processes.  These methods shall demonstrate the ability of the processes to achieve planned results.  When planned results are not achieved, correction and corrective action shall be taken, as appropriate, to ensure conformity of the product.

[12] 6.2.2 Competence, Awareness and Training - The organization shall:

    (a)  determine the necessary competence for personnel performing work that affected product quality;

    (b)  provide training or take other actions to satisfy these needs;

    (c)  evaluate the effectiveness of the actions taken.

    (d)  ensure that its personnel were aware of the relevance and importance of their activities and how they contribute to the achievement of the quality objectives;

    (e)  maintain appropriate records of education, training, and experience.

## SPECIFIC EXAMPLES OF DEFENDANTS' BREACHES OF THE CONTRACTS

74. The Relator discovered and reported to Defendant KOZLOWSKI the ongoing issues with both the quality assurance processes and the products that they produced and delivered to the United States Government, including the MK93 Gun Mounts.

### Defendants' Failure to do Magnetic Particle Inspections

75. The United States Government MK93 Gun Mounts specifications required magnetic particle inspections on, at least, the following three (3) part numbers:

- 12999574 - carriage;

- 5830054 - trunnion bolt;

- 5830084 - thumb screw.

76. Magnetic particle inspections were necessary to test and confirm the integrity of welds and the stress reliance of the parts.

77. Magnetic particle inspections were required to be performed by an outside approved vendor.

78. The Relator was aware of the fact that the three (3) identified parts of the MK93 Gun Mounts were not being sent out for the required magnetic particle inspections. The Relator confirmed that the Defendants were not and had not sent any parts in connection with the MK93 Gun Mounts for the required magnetic particle inspections.

79. Not performing the required magnetic particle inspections on the MK93 Gun Mounts is a violation of the guidelines set forth in MIL-STD-1916.

80.     Not performing the required magnetic particle inspections on the MK93 Gun Mounts is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

81.     The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the MK93 Gun Mounts expressly represented compliance with the contract terms and requirements, including compliance with the United States Government MK93 Gun Mounts specifications, despite the fact that the required magnetic particle inspections were knowingly not performed.

### Defendants' Failure to do Required Stress Relieving

82.     The United States Government MK93 Gun Mounts specifications required stress relieving for part No. 12999574 -- carriage -- to be performed by an outside approved vendor.

83.     Machining induces stresses in parts.  These stresses can cause distortions in the part during its long term use, including, cracking and change of hole locations causing the part to go out of tolerance.  For these reasons, stress relieving is often necessary.

84.     Stress relieving is done by subjecting the parts to a temperature of about 75° C (165° F) below the transformation temperature, which is about 727° C (1340° F) for steel.  Thus stress relieving is done at about 650° C (1202° F) for about one hour or until the entire part reaches the transformation temperature.  This process removes more than 90% of the internal stresses.  After removing from the furnace, the parts are air cooled in still air.

85. The Relator was aware of the fact that part No. 12999574 was not being sent out for the required stress relieving. The Relator confirmed that the Defendants were not and had not sent the required part in connection with the MK93 Gun Mounts for the required stress relieving.

86. Not performing the required stress relieving on the MK93 Gun Mounts is a violation of the guidelines set forth in MIL-STD-1916.

87. Not performing the required stress relieving on the MK93 Gun Mounts is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

88. The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the MK93 Gun Mounts expressly represented compliance with the contract terms and requirements, including compliance with the United States Government MK93 Gun Mounts specifications, despite the fact that the required stress relieving was knowingly not performed.

**Defendants' Use of Non-approved Vendors**

89. The United States Government MK93 Gun Mounts specifications require that the Defendants only use previously approved outside vendors in connection with the manufacturing of the MK93 Gun Mounts.

90. In order to make shipment deadlines and to increase Defendants' profits through cost savings, the Defendants used non-approved vendors in violation of the terms of the contractual requirements and MK93 Gun Mounts specifications.

22

91.     As the Buyer/Purchasing Manager, the Relator was aware that the Defendants often used Chem Processing, Inc., 3910 Linden Oakes Drive, Rockford, Illinois, to perform phosphate coating on the MK93 Gun Mount component parts, despite the fact that Chem Processing, Inc. was not an approved outside vendor for phosphate coating.

92.     As the Buyer/Purchasing Manager, the Relator was aware that the Defendants often used Core Finishing, 717 Thomas Drive, Bensenville, Illinois, to apply 383 Green Carc Paint on the MK93 Gun Mount component parts, despite the fact that Core Finishing was not an approved outside vendor for painting.

93.     Using non-approved vendors in connection with the manufacturing of the MK93 Gun Mounts is a violation of the guidelines set forth in MIL-STD-1916.

94.     Using non-approved vendors in connection with the manufacturing of the MK93 Gun Mounts is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

95.     The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the MK93 Gun Mounts expressly represented compliance with the contract terms and requirements, including compliance with the United States Government MK93 Gun Mounts specifications, despite the fact that non-approved vendors were knowingly used in connection with the manufacturing of the MK93 Gun Mounts.

96.     The United States Government M3 Tripod specifications require that the Defendants only use previously approved outside vendors in connection with the manufacturing of the M3 Tripods.

97.     In order to make shipment deadlines and to increase the Defendants' profits through cost savings, the Defendants used a non-approved vendor in violation of the terms of the contractual requirements and M3 Tripod specifications.

98.     As the Buyer/Purchasing Manager, the Relator was aware that the Defendants often used Chem Processing, Inc., 3910 Linden Oakes Drive, Rockford, Illinois, to perform phosphate coating on the M3 Tripod component parts, despite the fact that Chem Processing, Inc. was not an approved outside vendor for phosphate coating.

99.     Using a non-approved vendor in connection with the manufacturing of the M3 Tripods is a violation of the guidelines set forth in MIL-STD-1916.

100.    Using a non-approved vendor in connection with the manufacturing of the M3 Tripods is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

101.    The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the M3 Tripods expressly represented compliance with the contract terms and requirements, including compliance with the United States Government M3 Tripod specifications, despite the fact that a non-approved vendor was knowingly used in connection with the manufacturing of the M3 Tripods.

### The Defendants' use of Non-Mil-Spec Materials
### from Non-approved Vendors

102.    The United States Government MK93 Gun Mounts specifications required that the Defendants use military specification ("Mil-Spec") hardware from approved vendors in the manufacturing of the MK93 Gun Mounts.

103.    In order to make shipment deadlines and to increase the Defendants' profits through cost savings, the Defendants used non-military specified hardware that was purchased from non-approved vendors in violation of the terms of the contractual requirements and MK93 Gun Mounts specifications.

104.    As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase the non-military specified hardware from non-approved vendor, J&L Industrial, which was purchased by MSC Industrial Supply Co. in approximately 2006. John Hartman, from J&L Industrial's Michigan location, had advised Defendant KOZLOWSKI that he could sell to SIGMATEK all the hardware that was needed at a lot cheaper price. Despite the fact that J&L Industrial did not sell Mil-Spec hardware, Defendant KOZLOWSKI instructed the Relator to buy all hardware for the MK93 Gun Mounts specifically from John Hartman at J&L Industrial's Michigan location.

105.    From approximately 2007 until his departure, as the Buyer/Purchasing Manager, the Relator was instructed to buy Non-Mil-Spec hardware from John Hartman, from J&L Industrial's Michigan location, to be used for the MK93 Gun Mounts. Additionally, the Relator was instructed to place the orders for the Non-Mil-Spec hardware from J&L Industrial using the SIGMATEK name, despite the fact that MARATHON had the contracts for the MK93 Gun Mounts.

106. As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase Non-Mil-Spec stainless steel hardware and then have the stainless steel hardware coated with a black oxide coating as was required by the specifications of the MK93 Gun Mounts.

107. As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase Non-Mil-Spec stainless steel hardware for MARATHON Job No. 6081 (W52H09-04-D-0133) and MARATHON Job No. 6142 (W52H09-09-D-305), the manufacturing of MK93 Gun Mounts, to replace the required hardware for parts number:

- MS 35307-409 : ½ by 1 stainless steel hex cab screw
- MS 35307-303 : ¼ - 20 screw
- MS 35307-332 : 5/16 - 18 screw
- MS 51958-61B : 10-24 by 3/8 screw
- MS 51958-79B : pan head screw
- MS 21044-C3 : 10-32 by ½ screw
- MS 59158-64B : 10-32 nut
- 6650697 : jam nut

Each of these identified parts was replaced with non-conforming parts per the instruction of Defendant KOZLOWSKI.

108. As the Buyer/Purchasing Manager, the Relator was also instructed by Defendant KOZLOWSKI to purchase Non-Mil-Spec rivets for the manufacturing of the MK93 Gun Mounts from non-approved vendor Valley Fastener Group, LLC, 1490 Mitchell Road, Aurora, Illinois.

109.  Using Non-Mil-Spec hardware and rivets from non-approved vendors in connection with the manufacturing of the MK93 Gun Mounts is a violation of the guidelines set forth in MIL-STD-1916.

110.  Using Non-Mil-Spec hardware and rivets from non-approved vendors in connection with the manufacturing of the MK93 Gun Mounts is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

111.  The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the MK93 Gun Mounts expressly represented compliance with the contract terms and requirements, including compliance with the United States Government MK93 Gun Mounts specifications, despite the fact that Non-Mil-Spec hardware and rivets from non-approved vendors was knowingly used in connection with the manufacturing of the MK93 Gun Mounts.

112.  The United States Government M3 Tripods specifications required that the Defendants use Mil-Spec hardware and rivets from approved vendors in the manufacturing of the M3 Tripods.

113.  In order to make shipment deadlines and increase the Defendants' profits through cost savings, the Defendants used Non-Mil-Spec hardware and rivets that were purchased from non-approved vendors in violation of the terms of the contractual requirements and M3 Tripod specifications.

114.    As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase the Non-Mil-Spec hardware and rivets from non-approved vendors for SIGMATEK Job No. 6041 (W52H09-08-D-0147), the manufacturing of M3 Tripods, because it was less expensive and more readily available.

115.    As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase non-military specified stainless steel hardware and then have the stainless steel hardware coated with a black oxide coating as was required by the specifications of the M3 Tripods.

116.    As the Buyer/Purchasing Manager, the Relator was instructed by Defendant KOZLOWSKI to purchase Non-Mil-Spec hardware for the manufacturing of the M3 Tripods from non-approved vendor John Hartman, from J&L Industrial's Michigan location.

117.    As the Buyer/Purchasing Manager, the Relator was also instructed by Defendant KOZLOWSKI to purchase Non-Mil-Spec rivets for the manufacturing of the M3 Tripods from non-approved vendor Valley Fastener Group, LLC, 1490 Mitchell Road, Aurora, Illinois.

118.    Using Non-Mil-Spec hardware and rivets from non-approved vendors in connection with the manufacturing of the M3 Tripods is a violation of the guidelines set forth in MIL-STD-1916.

119.    Using Non-Mil-Spec hardware and rivets from non-approved vendors in connection with the manufacturing of the M3 Tripods is a violation of the quality assurance requirements defined by ISO9001, and the Defendants' own procedures and is evidence that the Defendants were delivering defective and nonconforming product to the United States Government.

120.    The Certificates of Conformance, which were prepared by the Defendants and signed by Defendant KOZLOWSKI, for the M3 Tripods expressly represented compliance with the contract terms and requirements, including compliance with the United States Government M3 Tripod specifications, despite the fact that Non-Mil-Spec hardware and rivets from non-approved vendors was knowingly used in connection with the manufacturing of the M3 Tripods.

### Defendants' Improper Signing of the Certificates of Conformance

121.    The fraudulent signing of the Certificate of Conformance accompanied by the DD Form 250 and knowingly presenting a claim for payment to an employee of the United States Government alone creates liability on the Defendants pursuant to 31 U.S.C. § 3729(a)(1)(A).

122.    The signer of the Certificate of Conformance is personally liable for its authenticity.

123.    The Certificate of Conformance references any waivers or deviations associated with that specific lot being sold to the United States Government.

124.    The Certificate of Conformance defines the product, part number, revision, lot size, and configuration of the product.  By signing the Certificate of Conformance, the authorizing agent certifies that the product met all the requirements and specifications of the contract.

125.    While the Relator was employed by the Defendants, the Certificates of Conformance were all signed by Defendant KOZLOWSKI.

29

**Defendants Fraudulently Obtained Contracts from the U.S. Army**

126.    On or about June 2007, Solicitation No. W52H09-07-R-0375, was issued from the United States Army for a contract to manufacture the M3 Tripod.

127.    The Relator advised Defendant KOZLOWSKI of the new solicitation, and advised KOZLOWSKI that the proposed contract was a 100% HUBZone set-aside contract. At the time neither Defendant MARATHON nor Defendant SIGMATEK was HUBZone Certified.

128.    The Small Business Administration's HUBZone program was designed to stimulate economic development and create jobs in urban and rural communities by providing Federal contracting preferences to qualified small businesses. To qualify for the HUBZone program a business must meet the following criteria:

      a.    It must be a small business by SBA standards;

      b.    It must be owned and controlled at least 51% by U.S. Citizens, or a Community Development Corporation, or an agricultural cooperative, or an Indian tribe;

      c.    Its principal office must be located within a HUBZone; and

      d.    At least 35% of its employees must reside in a HUBZone.

129.    Defendant KOZLOWSKI instructed the Relator to prepare the bid for Solicitation No. W52H09-07-R-0375, and that he would take care of the HUBZone certification requirement.

130.    The Relator knew that neither Defendant MARATHON nor Defendant SIGMATEK qualified for HUBZone certification because the principal office -- the location where the greatest number of employees at any one location actually performs their work -- for both MARATHON and SIGMATEK was at 800 Nicholas Blvd., Elk Grove Village, Illinois 60007, which is not located in a HUBZone.

131.    The Relator also knew that neither Defendant MARATHON nor Defendant SIGMATEK qualified for HUBZone certification because neither MARATHON nor SIGMATEK employed 35% of its employees that resided in a HUBZone.

132.    In or about August 2007, in order to obtain HUBZone certification for Defendant SIGMATEK, Defendant KOZLOWSKI rented a building located at 1710 Carmen Street, Elk Grove Village, Illinois 60007, which was located in a HUBZone.

133.    Not until March 2009, did any employees from SIGMATEK and/or MARATHON work at the building located at 1710 Carmen Street, Elk Grove Village, Illinois 60007.

134.    At no time while the Relator was employed by MARATHON did the building located at 1710 Carmen Street, Elk Grove Village, Illinois 60007, qualify as the principal office of SIGMATEK because it was never the location where the greatest number of employees at any one location actually performs their work.

135.    At no time while the Relator was employed by MARATHON did SIGMATEK have at least 35% of its employees reside -- to live in a primary residence at a place for at least 180 days, or as a currently registered voter, and with the intent to live there indefinitely -- in a HUBZone.  In fact, Defendant KOZLOWSKI would manipulate the payrolls moving and/or identifying MARATHON employees as SIGMATEK employees in an attempt to meet this requirement.

136.    Defendant KOZLOWSKI identified the Relator as the General Manager of SIGMATEK despite the fact that the Relator was never an employee of SIGMATEK.  The Relator was always employed by MARATHON.

137.    In its Pre-Award Report for Solicitation No. W52H09-07-R-0375, submitted to the United States Army, SIGMATEK made the following false statement:

> In the second half of 2003, SIGMATEK consolidated operations with MARATHON TECHNOLOGIES, INC. providing subcontractor services such as welding, fabrications and some machining. In the second half of 2007 the decision was made to start operating SIGMATEK, INC. as a independent company located at 1710 Carmen Street, Elkgrove Village, Illinois 60007.

138.    In connection with Solicitation No. W52H09-07-R-0375, SIGMATEK provided false documentation to demonstrate that SIGMATEK is HUBZone certified by the SBA.

139.    On or about December 11, 2007, SIGMATEK filed a fraudulent application with the SBA to become HUBZone certified.

140.    On or about December 19, 2007, Cean Hartleben, Contracting Officer from the U.S. Department of the Army, Rock Island Aresenal, sent a letter addressed to the Relator at SIGMATEK, in which it states:

> Reference TACOM-RI letter dated 19 Sep 2007 and SIGMATEK, INC. letter dated 27 Sep 2007. The undersigned contracting officer has reviewed the documents you provided to demonstrate that SIGMATEK is HUBZone certified by the Small Business Administration. After further investigation and communication with the Small Business Administration (SBA) and the SBA-HUBZone office it has verified that as of the date of this letter, your firm has not been certified as HUBZone. Your firm has only recently filed an application with the SBA on 11 December 2007.

141.    The December 19, 2007 letter further states:

> In accordance with the solicitation, page 2, paragraph 1, "To be considered for award, the offeror must be qualified HUBZone Small Business concern and must be listed in the HUBZone website or be able to provide proof of HUBZone certification by the Small Business Administration at the time of solicitation closing". This solicitation closed on 01 September 2007, therefore, your proposal will not be considered for award.

142.    On December 27, 2007, the Relator received a letter at SIGMATEK from the SBA stating: "I am pleased to advise you as that effective December 27, 2007 your application for certification as a 'qualified HUBZone small business concern (SBC)' has been approved."

143.    On December 27, 2007, the Relator was instructed by Defendant KOZLOWSKI to email Maria Vera, Contract Specialist from the U.S. Department of the Army, Rock Island Aresenal, and provide her with the December 27, 2007 letter from the SBA and ask her to reconsider the award.

144.    On December 28, 2007, the Relator received an email from Maria Vera, which states: "I received the email from the SBA, but I'm afraid that I cannot consider your quote because the Solicitation stated that you must be certified prior to closing date of Solicitation."

145.    On January 14, 2008, the next correspondence that the Relator received from Maria Vera was an email, which states: "Attached is Award for the M3 Tripod! Congratulations!!!!"

146.    On or about January 14, 2008, Defendant SIGMATEK won a $9,244,642 firm-fixed-price contract (W52H09-08-D-0147) from the United States Army to produce and deliver M3Tripods despite the fact that SIGMATEK did not meet the requirements of Solicitation No. W52H09-07-R-0375.

147.    SIGMATEK received its HUBZone certification and was allowed to participate in the HUBZone program based on false statements made to the SBA.

148.    Despite not properly qualifying for the HUBZone program, SIGMATEK was awarded the United States Army contract (W52H09-08-D-0147) that had been set aside for qualified HUBZone companies based upon the false statements SIGMATEK made to the United States Army and the SBA.

## COUNT I
## FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

149.    The allegations contained in paragraphs 1-125 are realleged and incorporated by reference herein.

150.    The Relator brings this Count I against Defendants, KOZLOWSKI, MARATHON, and SIGMATEK.

151.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability of any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

152.    From at least January 2006 until at least January 2011, Defendants knowingly presented to an employee of the United States Government false or fraudulent claims for payment when it presented the fraudulent Certificates of Conformance with the associated DD Form 250s and demands for payment for the MK93 Gun Mounts and M3 Tripods expressly and implicitly representing compliance with the contractual requirements.

153.    The Defendants intended that the United States Government rely on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of MK93 Gun Mounts and M3 Tripods shipments as a claim for payment.

154.    The United States Government relied on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of MK93 Gun Mounts and M3 Tripods, made monetary payments as requested and was damaged by the false claims made by the Defendants. The United States Government is entitled to full recovery of the amount of overpayment by the United States Government and/or full recovery of the amount paid by the United States

Government because "but for" the fraud perpetrated upon the United States Government such payments would not have been made.

155.    The Defendants submitted an unknown number of false claims to the United States Government.

156.    As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

      a.    That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

      b.    That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

      c.    That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d.    That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e.    That the Relator be awarded prejudgment interest;

f.    That the United States Government and Relator receive all relief, both in law and at equity, to which they may reasonably appear entitled.

g.    That a trial by jury be held on all issues.

## COUNT II
## FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729(a)(1)(B)

157.    The allegations contained in paragraphs 1-125 are realleged and incorporated by reference herein.

158.    The Relator brings this Count II against Defendants, KOZLOWSKI, MARATHON, and SIGMATEK.

159.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability of any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

160.    From at least January 2006 until at least January 2011, Defendants knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the United States Government when it presented the false or fraudulent Certificates of Conformance with the associated DD Form 250s and demands for

36

payment for the MK93 Gun Mounts and M3 Tripods expressly and implicitly representing compliance with the contractual requirements.

161. The Defendants intended that the United States Government rely on the fraudulent Certificates of Conformance with the associated DD Form 250s submitted with each lot of MK93 Gun Mounts and M3 Tripods shipments as a claim for payment.

162. The United States Government relied on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of MK93 Gun Mounts and M3 Tripods, made monetary payments as requested and was damaged by the false claims made by the Defendants. The United States Government is entitled to full recovery of the amount of overpayment by the United States Government and/or full recovery of the amount paid by the United States Government because "but for" the fraud perpetrated upon the United States Government such payments would not have been made.

163. The Defendants submitted an unknown number of false statements or records to the United States Government.

164. As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(B), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

      a. That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the

costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

b.   That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

c.   That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d.   That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e.   That the Relator be awarded prejudgment interest;

f.   That the United States Government and Relator receive all relief, both in law and at equity, to which they may reasonably appear entitled.

g.   That a trial by jury be held on all issues.

## COUNT III
## FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(C)

165.     The allegations contained in paragraphs 1-125 are realleged and incorporated by reference herein.

166.     The Relator brings this Count III against Defendants, KOZLOWSKI, MARATHON, and SIGMATEK.

167.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability of any person who "conspires to commit a violation of subparagraph (A), (B). . . ."

168.     From at least January 2006 until at least January 2011, KOZLOWSKI, conspired with MARATHON and SIGMATEK to defraud the United States Government by getting false or fraudulent claims allowed and paid.

169.     From at least January 2006 until at least January 2011, the Defendants conspired with each other and committed acts of fraud to intentionally deviate and/or omit critical quality assurance functions and processes to significantly reduce the cost to produce the MK93 Gun Mounts and M3 Tripods, thus producing and delivering Non-Military Grade products, but representing the products as Military Grade.

170.     KOZLOWSKI was fully aware of all of MARATHON's and SIGMATEK's fraudulent acts and activities.

171.     By understanding and agreement the Defendants manufactured, sold and delivered defective and nonconforming MK93 Gun Mounts and M3 Tripods to the United States Government for which the Defendants received monetary payments.

172.    The United States Government is entitled to full recovery of the amount overpaid by the United States Government and/or full recovery of the amount paid by the United States Government because "but for" the fraud and conspiracies perpetrated upon the United States Government such payments would not have been made.

173.    The Defendants pursuant to their conspiracies submitted an unknown number of false statements, records, and claims to the United States Government.

174.    As set forth in the preceding paragraphs, Defendants conspired to defraud the United States Government to get false claims allowed or paid and committed violations as defined in 31 U.S.C. § 3729(a)(1)(C).

175.    As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(C), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

a.    That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

b.    That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

c.    That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d.    That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e.    That the Relator be awarded prejudgment interest;

f.    That the United States Government and Relator receive all relief, both in law and at equity, to which they may reasonably appear entitled.

g.    That a trial by jury be held on all issues.

## COUNT IV
## FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

176.    The allegations contained in paragraphs 1-19, 54-60, 121-148 are realleged and incorporated by reference herein.

177.    The Relator brings this Count IV against Defendants, KOZLOWSKI and SIGMATEK.

178.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability of any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

179.    Defendants KOZLOWSKI and SIGMATEK knowingly presented to an employee of the United States Government false or fraudulent claims for payment in connection with Contract No. W52H09-08-D-0147 when it presented demands for payment for the M3 Tripods when it did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.

180.    The Defendants intended that the United States Government rely on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of M3 Tripods shipments as a claim for payment.

181.    The United States Government relied on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of M3 Tripods, made monetary payments as requested and was damaged by the false claims made by the Defendants, because SIGMATEK did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.  The United States Government is entitled to full recovery of the amount of overpayment by the United States Government and/or full recovery of the amount paid by the United States Government because "but for" the fraud perpetrated upon the United States Government such payments would not have been made.

182.    The Defendants submitted an unknown number of false claims to the United States Government.

183.    As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

a.    That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

b.    That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

c.    That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d.    That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e.    That the Relator be awarded prejudgment interest;

f.    That the United States Government and Relator receive all relief, both in

law and at equity, to which they may reasonably appear entitled.

g.    That a trial by jury be held on all issues.

## COUNT V
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)

184.    The allegations contained in paragraphs 1-19, 54-60, 121-148 are realleged and incorporated by reference herein.

185.    The Relator brings this Count V against Defendants, KOZLOWSKI and SIGMATEK.

186.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability of any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

187.    Defendants KOZLOWSKI and SIGMATEK knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the United States Government when it presented the false or fraudulent application with the SBA to become HUBZone certified; provided false or fraudulent documentation in connection with Solicitation No. W52H09-07-R-0375 to demonstrate that SIGMATEK was HUBZone certified by the SBA; Certificates of Conformance with the associated DD Form 250s and demands for payment for M3 Tripods when it did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.

188.    The Defendants intended that the United States Government rely on the false or fraudulent application with the SBA to become HUBZone certified.

189.    The Defendants intended that the United States Government rely on the false or fraudulent documentation in connection with Solicitation No. W52H09-07-R-0375 to demonstrate that SIGMATEK was HUBZone certified by the SBA and get awarded the Contract (No. W52H09-08-D-0147).

190.    The Defendants intended that the United States Government rely on the Certificates of Conformance with the associated DD Form 250s and demands for payment for M3 Tripods when it did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.

191.    The United States Government relied on the false or fraudulent application with the SBA to become HUBZone certified; on the false or fraudulent documentation in connection with Solicitation No. W52H09-07-R-0375 to demonstrate that SIGMATEK was HUBZone certified by the SBA and get awarded the Contract (No. W52H09-08-D-0147); and on the Certificates of Conformance with the associated DD Form 250s submitted with each lot of M3 Tripods, made monetary payments as requested and was damaged by the false claims made by the Defendants, because SIGMATEK did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment. The United States Government is entitled to full recovery of the amount of overpayment by the United States Government and/or full recovery of the amount paid by the United States Government because "but for" the fraud perpetrated upon the United States Government such payments would not have been made.

192.    The Defendants submitted an unknown number of false statements or records to the United States Government.

193.     As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(B), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

a.     That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

b.     That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

c.     That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d.     That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e.     That the Relator be awarded prejudgment interest;

f.     That the United States Government and Relator receive all relief, both in law and at equity, to which they may reasonably appear entitled.

g.     That a trial by jury be held on all issues.

## COUNT VI
## FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729(a)(1)(C)

194.    The allegations contained in paragraphs 1-19, 54-60, 121-148 are realleged and incorporated by reference herein.

195.    The Relator brings this Count VI against Defendants, KOZLOWSKI and SIGMATEK.

196.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability of any person who "conspires to commit a violation of subparagraph (A), (B). . . ."

197.    From at least June 2007 until at least January 2011, KOZLOWSKI, conspired with SIGMATEK to defraud the United States Government by getting false or fraudulent claims allowed and paid.

198.    From at least June 2007 until at least January 2011, the Defendants conspired with each other and committed acts of fraud when it presented the false or fraudulent application with the SBA to become HUBZone certified; provided false or fraudulent documentation in connection with Solicitation No. W52H09-07-R-0375 to demonstrate that SIGMATEK was HUBZone certified by the SBA; Certificates of Conformance with the associated DD Form 250s and demands for payment for M3 Tripods when it did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.

47

199.    KOZLOWSKI was fully aware of all of SIGMATEK's fraudulent acts and activities.

200.    By understanding and agreement the Defendants knowingly conspired with each other and committed acts of fraud when it presented the false or fraudulent application with the SBA to become HUBZone certified; provided false or fraudulent documentation in connection with Solicitation No. W52H09-07-R-0375 to demonstrate that SIGMATEK was HUBZone certified by the SBA; Certificates of Conformance with the associated DD Form 250s and demands for payment for M3 Tripods when it did not qualify as a HUBZone Company at the time the Contract (No. W52H09-08-D-0147) was awarded and at the time of the demands for payment.

201.    The United States Government is entitled to full recovery of the amount overpaid by the United States Government and/or full recovery of the amount paid by the United States Government because "but for" the fraud and conspiracies perpetrated upon the United States Government such payments would not have been made.

202.    The Defendants pursuant to their conspiracies submitted an unknown number of false statements, records, and claims to the United States Government.

203.    As set forth in the preceding paragraphs, Defendants conspired to defraud the United States Government to get false claims allowed or paid and committed violations as defined in 31 U.S.C. § 3729(a)(1)(C).

204.    As set forth in the preceding paragraphs, Defendants have knowingly committed violations as defined in 31 U.S.C. § 3729(a)(1)(C), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, the Relator, LAWRENCE MCCARTHY, on behalf of himself and the United States Government prays:

a. That this Court enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action.

b. That the Relator be awarded all costs incurred, including reasonable attorney's fees and expenses.

c. That, on those allegations for which the United States Government intervenes and continues to proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

d. That, on those allegations for which the United States Government does not intervene or proceed with this action, the Relator be awarded an amount for bringing and prosecuting this action of at least 25%, but not more than 30%, of the proceeds of the action or settlement of the claim;

e. That the Relator be awarded prejudgment interest;

f. That the United States Government and Relator receive all relief, both in law and at equity, to which they may reasonably appear entitled.

g. That a trial by jury be held on all issues.

Respectfully submitted,
RELATOR,

s/    Brian R. Holman

HOLMAN & STEFANOWICZ, LLC
By:    Brian R. Holman

Brian R. Holman
Dennis H. Stefanowicz, Jr.
Tara Beth Davis
HOLMAN & STEFANOWICZ
Attorneys for the RELATOR
233 South Wacker Drive, Suite 5620
Chicago, Illinois 60606
(312) 258-9700